ROHM AND HAAS COMPANY,
Plaintiff,

v.

ENVIRONMENTAL PROTECTION AGENCY et al., Defendants,

and

The Mobil Oil Corporation,
Defendant-Intervenor.

Civ. A. No. 81–1847.

United States District Court,
E. D. Pennsylvania.

May 18, 1981.

As Amended May 19, 1981.

James J. Binns, Philadelphia, Pa., Patrick M. Raher, David J. Hayes, Hogan & Hartson, Washington, D. C., for plaintiff; Robert P. Vogel, Rohm & Haas Co., Philadelphia, Pa., of counsel.

Patrick Cafferty, Washington, D. C., for the E. P. A.

David Richman, Pepper, Hamilton & Scheetz, Philadelphia, Pa., A. Duncan Whitaker, Mark Wegener, Ray A. Jacobsen, Jr., Howrey & Simon, Harold Himmelman, Cynthia A. Lewis, Beveridge & Diamond, Washington, D. C., for Mobil Oil Corp., Thomas J. Winans, Deborah E. Lynch, New York City, of counsel.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. PRELIMINARY STATEMENT

This case arises under the Federal Insecticide, Fungicide and Rodenticide Act, as amended ("FIFRA"), 7 U.S.C. § 136 *et seq.*, a regulatory statute which renders unlaw-

ful the distribution of pesticides not registered with the United States Environmental Protection Agency ("EPA"). While the case is set generally against the background of administrative and environmental law, what it really poses is a question of statutory construction. Among the most difficult tasks assigned to federal judges is that of determining the congressional intent when attempting to construe opaque provisions of a regulatory statute, the history and structure of which reflect countervailing policy considerations imperfectly synthesized by the statutory draftsmen. This case presents such a challenge.

The plaintiff is Rohm and Haas Company ("Rohm & Haas"), a major producer and supplier of chemical products to world-wide industrial and agricultural markets. Rohm & Haas brought this action on May 4, 1981, a scant 14 days ago, seeking to prevent EPA from issuing to defendant-intervenor, The Mobil Oil Corporation ("Mobil") an Experimental Use Permit ("EUP") pursuant to Section 5 of FIFRA, 7 U.S.C. § 136c, and the regulations which EPA has promulgated to implement § 5, 40 C.F.R. § 172. That permit would allow Mobil, which is a competing producer and supplier of chemical products (through its Mobil Chemical Division), to conduct certain tests on a new pesticide product called "Tackle" which it is developing. Tackle, like "Blazer", a product which Rohm & Haas has commercially marketed since April, 1980, is a postemergent herbicide used principally for broadleaf weed control on soybeans.

The soybean crop in the United States is planted between May 15 and July 15 of each year, and, in order to be effective, a herbicide must be applied within 14 to 23 days after planting. Because it is undisputed that, unless this matter is resolved in time for Mobil to finalize its arrangement with the soybean farmers who are to test the pesticide and deliver it to the test loca-

tions, another year's planting season will go by, we have given this case expedited consideration. On the afternoon of May 4 we heard oral argument on plaintiff's request for a restraining order, but declined to grant relief, concluding that it would be more appropriate to hold a full hearing on plaintiff's motion for a preliminary injunction. As we learned more about the case and determined that what was at issue was essentially a question of law, we exercised our powers under Rule 65(a)(2) of the Federal Rules of Civil Procedure and advanced the trial on the merits, consolidating it with a hearing on the preliminary injunction. The trial took place on the afternoon and evening of May 7th and the morning of May 8, 1981, and was followed by post-trial argument on May 11, 1981. In addition, the parties have filed extensive briefs. This opinion, which constitutes our Findings of Fact and Conclusions of Law pursuant to FRCP 52(a), finally disposes of the matter and places it, as has been our intention, in a posture for a prompt ruling by the Court of Appeals. Thus, the rights of the parties can be adjudicated without the effectuation of relief by a mere default through the passage of time.

Although the problem of statutory construction involved in this case is convoluted, the factual background is rather simple. Both Blazer and Tackle contain the same active ingredient—the sodium salt of a synthetic chemical compound whose common name is acifluorfen. Acifluorfen was apparently developed independently by both Rohm & Haas and Mobil, who have been engaged for several years in litigation over the patent rights to the chemical.[1] The record does not reflect when Mobil identified the sodium salt of acifluorfen for potential use as a pesticide. It does reflect, however, that Rohm & Haas identified it in 1973 and that, in order to commercialize its new discovery, Rohm & Haas conducted

1. See Rohm and Haas Company v. The Mobil Oil Corporation, Civil Action No. 78–384 (D.Del.) and The Mobil Oil Corporation v. Rohm and Haas Company, Civil Action No. 79–397 (D.Del.) We do not concern ourselves herein with the recriminations among the parties as to which is the "bad guy" nor with the question whether this litigation is part of the on-going competitive struggle between Rohm & Haas and Mobil concerning their respective herbicides.

924

various toxicity, residue, and environmental tests from 1975 through 1976 to demonstrate that the use of a compound containing acifluorfen could be used on soybeans on an experimental basis without risk to health or environment. It is also undisputed that, based upon these tests and upon extensive data submitted by Rohm & Haas to the EPA, on November 1, 1977 the EPA granted Rohm & Haas' application for an EUP. It is also undisputed that, under the authority of the EUP, Rohm & Haas conducted additional tests and submitted voluminous additional data to the EPA, resulting in the full registration of Blazer pursuant to § 3 of FIFRA on April 10, 1980.

This case arises because of the following state of affairs (described more precisely in our formal Findings of Fact). First, when EPA considered Mobil's application for an EUP for Tackle, it compared Mobil's product chemistry data with product chemistry data earlier submitted by Rohm & Haas for Blazer. Second, the EPA's conclusion that granting Mobil a permit for experimental use of Tackle on soybeans and allowing the sale and distribution of Tackle-treated soybeans in commerce would not subject the public to any risks over and above those risks, if any, posed by the use of Rohm & Haas' Blazer on soybeans, depended upon a comparison of the product chemistry data submitted by Mobil for Tackle with that submitted by Rohm & Haas for Blazer and upon a comparison of the EUP label terms and conditions proposed by Mobil for Tackle with those approved for Rohm & Haas' Blazer registration. EPA's conclusion that issuance of the EUP to Mobil was warranted was thus based on Rohm & Haas' registration of Blazer, which, in turn, was issued on the basis of Rohm & Haas' data. EPA would thus not have granted Mobil's EUP without Rohm & Haas' data on file.

Rohm & Haas has advanced three principal arguments in support of its action to enjoin the issuance of the EUP to Mobil. First, Rohm & Haas contends that EPA cannot base the issuance of Mobil's EUP on data submitted by Rohm & Haas because Section 5 of FIFRA does not allow an EUP to be issued to an applicant based upon data submitted by another company. Rohm & Haas insists that an EUP must be based solely on data submitted by the applicant. Rohm & Haas argues alternatively that, even if Section 5 does not prevent the issuance of an EUP based on data other than data submitted by the applicant, certain data consideration restrictions contained in Section 3(c)(1)(D) of FIFRA are applicable to the issuance of EUPs and preclude EPA from basing Mobil's EUP on data previously submitted by Rohm & Haas. These data consideration restrictions, which are described in detail infra and which are at the heart of plaintiff's case, confer upon those who have expended effort and funds in research and development of scientific data certain long-term rights of exclusive use to that data, or at least the right of compensation for its use. They reflect one of the statutory policies at issue in this case—that of encouraging research and innovation by protecting the fruits of the innovator's work. The bulk of the legal argumentation and briefing—and of the discussion herein—will concern the § 3(c)(1)(D) point and will, of course, include consideration of the countervailing policies referenced by defendants—the alleged dominant congressional purpose of achieving safe and effective registration of new pesticides, and administrative convenience, insofar as these policies, too, may inform our construction of the statute.

The third and final point pressed by Rohm & Haas is related to the publication of a Federal Register notice by EPA on May 5, 1981, 46 Fed.Reg. 25138, describing Mobil's application for an EUP and inviting public comments thereon. The EPA has maintained that this publication was unnecessary because it was not required by the EPA's standards for Federal Register publication and that the publication was a reaction (or overreaction) to the persistence of Rohm & Haas' counsel in his efforts to determine with precision EPA's intentions in the matter. EPA has announced its intention to issue the EUP without reference to such comment as may be received, and Rohm & Haas, predictably, has asserted

that the issuance of a permit prior to fair opportunity for comment and adequate consideration thereof is unlawful.

In the third segment of this opinion we will describe the contentions of the parties in greater detail, after first having explained the relevant regulatory scheme. At this juncture we note only that defendants counter each of the points raised by the plaintiff.

The trial of the case was preceded by a one and one-half day discovery period which resulted in an extensive stipulation of facts by Rohm & Haas and EPA. During the interim between the temporary restraining order conference and the trial, we granted, over opposition of the plaintiff, the motion of Mobil to intervene as a party defendant. Mobil adopted virtually all the stipulated facts. The trial consumed the equivalent of one and one-half trial days.[2] In addition to the stipulated facts, various documents and several affidavits, the plaintiff offered two witnesses, Dr. Stephen F. Krzeminski, the Rohm & Haas Manager of Regulatory Affairs for North America and of registration activities throughout the world, and Dr. Jerry Smith, its Chief Toxicologist. The EPA called James Wilson Akerman, Branch Chief for Fungicides and Herbicides in the Registration Division. Mobil called no witnesses, but like the plaintiff relied on certain affidavits of its employees as well as on the stipulation of facts and a few documents.

Notwithstanding the pendency of the motion for preliminary injunction, we devoted the trial to the merits and did not dwell upon the issues of irreparable harm or the balance of harm to the parties and the public, which would have been necessary were we to adjudicate the issues involved in the preliminary injunction motion. That approach was a function of our intention to render a prompt decision on the merits (delivered herein); it enabled us to move more rapidly, unburdened by the difficult and time-consuming balance of harm questions.

So as to obviate the necessity of ruling upon the temporary restraining order and preliminary injunction applications in the interim, EPA agreed not to issue the EUP permit to Mobil pending our final decision.

In the ordinary course, findings of fact would be our first order of business after the preliminary statement. However, because the findings of fact in this case are inextricably woven to the fabric of the regulatory scheme, we must first discuss that scheme, starting with the statute and the EPA regulations and then turning to the EPA's *modus procedendi* in dealing with EUP applications, particularly the genre which the EPA dubs "me-too" applications. The description of the EPA practices should be considered a part of our findings of fact. The balance of the findings will follow our description of the regulatory scheme; they will, in the main, deal with the manner in which the EPA treated Mobil's application for an EUP for "Tackle." Factual matters are not, for the most part, in dispute.

Finally, we shall, in our discussion of the law, explain the reasons for our decision—that the interpretation of the statute advanced by the EPA and Mobil appears to be the correct one, resulting in our decision to find in favor of the defendants. Because we have had so little time to develop an opinion in the matter (we have been on a protracted trial in another case since this case was filed), we have drawn heavily upon the parties' requested findings and summaries of the statutory scheme, and are not entirely happy with the organization of the discussion or the opinion as a whole. This may be the classical example of writing a long opinion because there was not time to write a short one.

## II. THE STATUTORY SCHEME

The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq*, gives EPA comprehensive authority to regulate the use of pesticides in the United States.[3] FIFRA makes it unlawful

---

2. We note that the expedited trial was agreed to by the parties.

3. As originally enacted in 1947, 61 Stat. 163, FIFRA required that all pesticides shipped in interstate commerce be registered with the Sec-

for anyone to sell or distribute any pesticide that has not been registered with EPA. FIFRA Section 3(a), 7 U.S.C. § 136a. EPA registration of pesticides is governed by Section 3 of FIFRA, which provides that EPA is to register a pesticide if use of the pesticide will not cause unreasonable adverse effects on the environment. FIFRA Section 3(c)(5), 7 U.S.C. § 136a(c)(5).

EPA is also authorized, in Section 5 of FIFRA, 7 U.S.C. § 136c, to issue an "Experimental Use Permit" ("EUP") to allow a potential registration applicant to test the pesticide prior to seeking registration. EUPs authorize limited use of a product on a limited number of acres under tightly controlled conditions for the purpose of helping to determine whether the product can ultimately be registered for sale. An EUP, once granted, does not represent a decision by EPA to grant registration and does not entitle the holder of the EUP to launch the pesticide on the market. Only a registration granted under Section 3 in compliance with all the terms of that section constitutes authorization to market.

In order for EPA to make the determination that a pesticide will not cause unreasonable adverse effects, an applicant seeking EPA registration of a pesticide must submit or cite data documenting the safety and efficacy of the pesticide.[4] FIFRA Section 3(c)(1)(D), 7 U.S.C. § 136a(c)(1)(D). For purposes of this litigation, the most important information requirement imposed on applicants for registration is that imposed in Section 3(c)(1)(D), 7 U.S.C. § 136a(c)(1)(D), which requires a variety of test data defining the risks and benefits of the product for which registration is sought. This information, as set forth in the Regulations, includes test data reflecting the effectiveness of the pesticide in performing its past suppression function ("efficacy data") and test results concerning the dangers of the product ("hazard data").[5]

When an applicant seeks to register a product which is the same or substantially the same as a previously registered product, EPA practice has been to not require the subsequent, or "me-too," applicant to submit its own data. Rather, EPA permits the "me-too" applicant to rely on the efficacy and hazard data already submitted. However, in Section 3(c)(1)(D), Congress established certain limitations on EPA's ability to consider data submitted by one company in support of applications filed by another

retary of the United States Department of Agriculture ("USDA"). In addition, the Food and Drug Administration ("FDA") set tolerances for those pesticides that might leave a residue on food crops. Authority over the regulation of pesticides under FIFRA was transferred from the USDA and the FDA to the EPA on December 2, 1970, by Reorganization Plan No. 3 of 1970, 35 *Fed.Reg.* 15623 (1970).

On October 21, 1972, FIFRA was extensively amended by the Federal Environmental Pesticide Control Act, Pub.L.No. 92–516, 86 Stat. 973 ("FIFRA–1972"). FIFRA–1972 expanded FIFRA to cover pesticides in intrastate commerce and required that all future pesticide registrants provide additional research and test data to support their applications. FIFRA was again amended in 1975 ("FIFRA–1975"), 89 Stat. 751, and again extensively on September 30, 1978 by the Federal Pesticide Act of 1978, Pub.L.No. 95–396, 92 Stat. 819 ("FIFRA–1978").

**4.** EPA is required to publish guidelines specifying the types of supporting data that will be required, FIFRA Section 3(c)(2)(A), 7 U.S.C. § 136a(c)(2)(A), and has now proposed or made available drafts of guidelines setting forth data requirements with respect to product chemistry, hazard evaluation, product performance, and environmental safety. *See, e. g.,* 43 *Fed. Reg.* 29696 (July 10, 1978); 43 *Fed.Reg.* 37336 (August 22, 1978).

**5.** Hazard data consist of the following major types of studies: 1) acute toxicity studies, which define how poisonous the pesticide is when ingested, inhaled, or applied to the skin or eyes; 2) chronic toxicity studies, which are used to determine if chronic exposure to the pesticide will have any long-term health effects such as causing cancer or birth defects; 3) residue studies, which define the level of the pesticide and its degradation products which remain in the food; 4) environmental chemistry studies, which are used to determine how much of the pesticide and its degradation products remain in the environment after application; and 5) fish and wildlife studies, which define how toxic the pesticide is to fish and wildlife which may be exposed to the pesticide after application in the environment.

company.[6] For purposes of this case, the most significant data-consideration limitation is that found in Section 3(c)(1)(D)(i), which prohibits EPA from considering, without the permission of the data submitter, data submitted in support of the registration of a pesticide containing an active ingredient[7] registered for the first time after September 30, 1978 in support of another company's application. This "exclusive use" period lasts for 10 years after the product is first registered.[8]

In addition, in the case of a pesticide which will be applied to food or feed crops,[9]

6. The Section 3(c)(1)(D) data-consideration requirements were first included in FIFRA in the 1972 amendments. *See* 86 Stat. at 979–81. Those requirements were modified in the 1975 amendments (89 Stat. at 755) and were completely rewritten in the 1978 amendments (92 Stat. at 820–22). The current Section 3(c)(1)(D) requirements are those enacted by Congress in the 1978 amendments.

7. The active ingredient is that which accomplishes the job that makes the product valuable. The remaining ingredients are referred to as inert ingredients.

8. The relevant section provides:
 (1) Statement required.—Each applicant for registration of a pesticide shall file with the Administrator a statement which includes

 .   .   .   .   .

 (D) except as otherwise provided in subsection (c)(2)(D) of this section, if requested by the Administrator, a full description of the tests made and the results thereof upon which the claims are based, or alternatively a citation to data that appear in the public literature or that previously had been submitted to the Administrator and that the Administrator may consider in accordance with the following provisions:
 (i) With respect to pesticides containing active ingredients that are initially registered under this subchapter after September 30, 1978, data submitted to support the application for the original registration of the pesticide, or an application for an amendment adding any new use to the registration and that pertains solely to such new use, shall not, without the written permission of the original data submitter, be considered·by the Administrator to support an application by another person during a period of ten years following the date the Administrator first registers the pesticide: *Provided,* That such permission shall not be required in the case of defensive data.

an applicant must first obtain a tolerance from EPA before a registration can be issued for that use. The tolerance requirement is imposed by Section 408 of the Federal Food, Drug, and Cosmetic Act ("FFDCA"), 21 U.S.C. § 346a. In essence, a tolerance defines the level of the pesticide product and its degradation products which is not to be exceeded in a food or feed crop to which the pesticide is applied or in animal products (meat, milk, and eggs) derived from animals which have eaten feed crops to which the pesticide has been applied. The level at which a tolerance is set is the level required to protect the public from

FIFRA Section 3(c)(1)(D)(ii) further governs EPA's consideration of data to support a registration application submitted by someone other than the original submitter. Data other than that protected by the exclusive use provisions, submitted after December 31, 1969, may be used to support a subsequent applicant's registration application without the original data submitter's permission. However, the subsequent applicant must offer to compensate the original data submitter for use of the data; the submitter is entitled to such compensation for a period of fifteen years following submission of the data. If the submitter and the applicant cannot agree on appropriate compensation, the matter will be referred for arbitration under rules promulgated by the Federal Mediation and Conciliation Service. (29 C.F.R. Part 1440, 45 *Fed.Reg.* 55394, August 19, 1980). EPA is not required to await the outcome of such arbitration before making its decision on registration. In sum, the use and compensation scheme creates three categories of research and test data: (1) research and test data submitted by applicants before January 1, 1970 (the statute does not explain what protection this data receives); (2) research and test data submitted after September 30, 1969 that does not fall into the third category of data (the statute authorizes the EPA to use this data in support of pesticide applications by persons other than the data originator, but only if the other persons agree to compensate the data originator for the value of the data); (3) research and test data submitted in support of new pesticides that are registered after September 30, 1978 (the statute gives this data an "exclusive use" period of ten years in which the EPA has no authority to use the data in support of the applications of persons other than the data originator.)

9. Food or feed crops are crops which will be consumed directly by humans or which will be fed to animals whose meat, milk, or eggs will be consumed by humans.

adverse health effects caused by chronic dietary exposure to pesticides. Although a separate tolerance must be established for each crop to which a particular active ingredient will be applied, once a tolerance has been set for a particular active ingredient it is applicable to *all* products containing that active ingredient. Thus, EPA does not require "me-too" applicants to ask EPA to reestablish the tolerance when they submit their applications for registration.[10]

A separate section of FIFRA—Section 5, 7 U.S.C. § 136c—governs the issuance of an EUP. An EUP allows the permit holder to apply a limited amount of his unregistered product to a limited number of acres for the purpose of performing tests necessary to obtain registration of that product. Section 5 is silent on the question whether EPA may consider data submitted by one company in support of an EUP application filed by another company, containing no provision analogous to section 3(c)(1)(D).

The regulations that EPA has promulgated to implement the requirements of Section 5 are contained in 40 C.F.R. Part 172. There are two basic types of EUP's: one for a new use for a previously registered product, and the second for a new, as yet unregistered, product. The information which EPA may require to be submitted in support of an application is described in 40 C.F.R. § 172.4. Subsection 172.4(b)(1) describes the general information which all applicants must submit, consisting principally of details of the testing program which the applicant plans to undertake under his permit. Subsection 172.4(b)(2) also describes the tolerance requirements that must be met if the product is to be tested on food or feed crops.[11]

Finally, 40 C.F.R. § 172.4(b)(3) sets forth certain additional information requirements for unregistered pesticides. The additional information required includes information regarding the composition of the pesticide product, some data regarding the existence of residues after application in the environment (if available), and certain toxicity tests which would indicate the potential for causing injury to the users or other persons exposed to the pesticide. The short of it is that considerably less data is required to support the issuance of an EUP than is required to support the issuance of a Section 3 registration. *See* footnote 5, *supra*. It should also be noted, however, that the grant of an EUP does not in any way assure the eventual issuance of a registration, but simply provides a mechanism to allow a potential registration applicant to generate the data necessary to support its registration. EUPs are generally routinely granted, provided that EPA does not conclude that the experimental use will cause unreasonable adverse effects on man or the environment.

The EPA uses a similar "me-too" approach when evaluating EUPs to the approach it uses when evaluating registration applications. Under that approach, the EPA simply analyzes a proposed pesticide's product chemistry data and its label, compares its analysis with a registered pesticide's product chemistry data and label, and, if there is substantial similarity, grants an EUP to the applicant. The theory behind the "me-too" approach is that once the EPA is assured that an applicant's product has the same chemistry and will be used in the same manner as an already-registered pesticide, the EPA can rely upon the already-registered pesticide's supportive research and test data as evidence that the "substantially similar" product will not harm health or the environment. When using the "me-too" approach and relying upon the original registrant's research and test data, the EPA does not actually re-review the data submitted by the original

---

**10.** Tolerances thus established are published in the Federal Register and are not subject to data consideration restraints.

**11.** Generally, if the applicant can show that a tolerance has already been established or that a tolerance should be established, then the crops

to which the pesticide is applied during the testing program can be sold commercially. On the other hand, if there is no tolerance and no tolerance can be established, then the crop must be destroyed or fed only to experimental animals.

applicant. Rather, the agency assumes that because the data were sufficient to obtain an initial registration, the data should also sustain a substantially similar product.

It is EPA's use of this approach in approving a "me-too" EUP application for Mobil's Tackle based upon Rohm & Haas' previously submitted Blazer data which gave rise to this litigation. We turn to the contentions of the parties.[12]

### III. THE CONTENTIONS OF THE PARTIES

Rohm & Haas, plaintiff in this litigation, markets a registered pesticide, Blazer. The data submitted by Rohm & Haas to EPA in support of its Blazer registration application is concededly protected under the exclusive use provision of FIFRA. That data was referenced by EPA in evaluating Mobil's application for an EUP for Tackle, a product the EPA found to be "substantially similar."

As we have noted above, Rohm and Haas contends: (1) that EPA cannot base the issuance of Mobil's EUP on data submitted by Rohm & Haas because Section 5 requires that an EUP be based *solely* on data submitted by the applicant; (2) that the data consideration restrictions contained in Section 3(c)(1)(D) of FIFRA at all events preclude EPA from basing Mobil's EUP on data submitted by Rohm and Haas; and (3) that EPA cannot issue the EUP to Mobil until it has evaluated public comments on

the proposed EUP emanating from the Federal Register publication.

The arguments raised by Rohm and Haas essentially present three distinct legal issues: 1) whether Section 5 allows an EUP to be based on data other than data submitted by the applicant; 2) whether, if Section 5 allows EUP's to be based on data other than data submitted by the applicant, the data consideration restrictions established by Section 3(c)(1)(D) are applicable to EUP's; and 3) whether the EUP which EPA proposed to issue Mobil is of national ior regional significance so as to require publication of a Federal Register notice pursuant to 40 C.F.R. § 172.11.

On the first question, Rohm & Haas relies upon what it characterizes as the "clear language" of FIFRA's EUP provision,[13] with reference to the provision that calls for the Administrator to act "after receipt of the application and all required supporting data." In Rohm and Haas' submission, that provision requires that all needed research and test data be "received" by EPA from the applicant, and that nothing already in EPA's files may be used. Secondly, Rohm & Haas cites 40 C.F.R. § 172.-4(b)(vi), one of the regulations governing issuance of an EUP, which lists as one item required to be submitted in support of an EUP application:

(vi) A description and the specific results of any appropriate prior testing of the product conducted by the applicant to

---

**12.** Mr. Akerman testified that the challenge to the EUP involved in this case is virtually *sui generis.* He could not recall any previous instance of a challenge to issuance of an EUP or of a "me-too" EUP application. Mr. Akerman explained that applicants for registration of "me-too" products do not usually attempt to generate their own data to support their registration, but rather rely upon data submitted by the first applicant, with whom the applicant will have made a compensation arrangement (unless the data is pre-1970, in which case that is not necessary). Perhaps the matters set forth in Note 1 explain what happened here.

**13.** 7 U.S.C. § 136c(a) provides:
 Issuance.—Any person may apply to the Administrator for an experimental use permit for a pesticide. The Administrator shall review the application. After completion of

the review, but not later than one hundred and twenty days after receipt of the application and all required supporting data, the Administrator shall either issue the permit or notify the applicant of the Administrator's determination not to issue the permit and the reasons therefor. The applicant may correct the application or request a waiver of the conditions for such permit within thirty days of receipt by the applicant of such notification. The Administrator may issue an experimental use permit only if the Administrator determines that the applicant needs such permit in order to accumulate information necessary to register a pesticide under section 136a of this title. An application for an experimental use permit may be filed at any time.

determine toxicity and effects in or on target organisms at the site of application; and to determine phytotoxicity and other forms of toxicity or effects on non-target plants, animals, and insects at or near the site of application; and to determine adverse effects on the environment; Rohm & Haas reads this section as requiring that all safety and efficacy tests be conducted "by the applicant."

EPA and Mobil contend that these sections do not in any way provide that all data used to support an EUP application be independently generated and submitted by, the company seeking the EUP. They find Rohm & Haas' reading of "receipt" in section 5 strained, and argue that the statute does not prohibit EPA from considering anything it wishes, including data previously submitted by other applicants. As to the regulatory provision quoted *supra*, defendants argue that it is intended merely to require that if an applicant has generated test data, that data should be submitted with the application. Nothing in the language, defendants contend, prohibits an EUP applicant from citing, if it desires, or EPA from considering, data submitted by another party. In short, defendant argues that there is no indication in section 5 or in the regulations governing EUP's that requires an EUP to be based solely on data submitted by the applicant.

If Section 5 does not prevent the issuance of an EUP based on data other than that submitted by the applicant, Rohm & Haas argues that the data consideration provisions contained in Section 3(c)(1)(D), which grant Rohm & Haas exclusive use of the data submitted in support of their Blazer registration application for a ten-year period, preclude EPA from considering Rohm & Haas' data in connection with Mobil's EUP application. The issue presented is whether the absence of an exclusive use/data compensation scheme in Section 5 comparable to that found in Section 3 means that EPA is not authorized to consider other data in support of an EUP application. Rohm & Haas argues that the data compensation/exclusive use provisions of FIFRA Section 3 are the only authorization for EPA consideration of another company's data and that absence of those provisions in Section 5 means that other data may not be considered in an EUP proceeding.

Mobil and EPA argue, to the contrary, that the enactment in 1972 of the first data compensation provision, and the 1978 FIFRA amendments which added the exclusive use provision and revised the data compensation provision, did not need to authorize EPA to consider other data in its files; the Agency had done so for many years and Congress was well aware of that practice. Rather, defendants contend that those provisions were enacted as narrow restrictions on EPA's practice of considering data already in its files.

Additionally, defendants contend that the explicit language of the statute limits the exclusive use provision to EPA's consideration of data relied on by an applicant for registration, and that the provision therefore has no applicability to applications for EUPs such as Mobil's. Defendants point to the wording of the exclusive use provision found in Section 3(c)(1)(D), which is therein described as governing EPA's use of an earlier registrant's data which have been cited by "an applicant for *registration* of a pesticide." (emphasis supplied). Defendants argue that when Section 3(c)(1)(D)(i) speaks of EPA consideration of data "to support an application by another person," "application" necessarily means "application for registration," not "application for an EUP," and that to extend the "exclusive" use provision to applications for EUPs is not authorized by the statute. This interpretation, defendants also suggest, is reflected in EPA's pesticide registration publications, which define "applicant" as a "person who applies for registration pursuant to section 3 of the Act." 40 C.F.R. § 162.3(i).

By way of contrast, defendants argue, Section 5, the experimental use section of the act, has no comparable compensation provisions. The dichotomy defendants perceive between applications for registrations and applications for Experimental Use Per-

mits is in their view also reflected in EPA's regulations. The registration regulations incorporate the exclusive use provision and provide that the Administrator "may not grant any *application for registration*" that relies on data protected by the exclusive use provision. 40 C.F.R. § 162.2(g)(1) (emphasis added). In contrast, the EUP regulations make no reference to the data requirements of FIFRA Section 3(c)(1)(D) and do not require compliance with the exclusive use provision as a condition for the issuance for an EUP. *See, e. g.*, 40 C.F.R. § 172.-4(b)(1)(vi) (describing test data to be submitted in support of an EUP application) and § 172.5(a) (governing EPA's issuance of an EUP). Arguing from the negative inference presented by the absence of any mention in section 5 or its governing regulations of any data compensation scheme coupled with the frequent use of the term "applications for registration" in conjunction with data compensation regulations, defendants maintain that the exclusive use provision has nothing whatever to do with data used to evaluate an EUP application. Experimental use permits and their issuance by EPA are governed by Section 5 of FIFRA, which contains its own provisions regarding review and submission of data. Section 5, in defendants' submission, does not require the person seeking an EUP to obtain another applicant's permission or compensate another applicant for use of its data, nor does Section 5 require EPA to consider data supporting an EUP in accordance with the restrictions set forth in Section 3(c)(1)(D).

Rohm & Haas rejoins largely on policy grounds, suggesting that it is their proprietary interest in their data that is protected, and that protecting that data in conjunction with applications for registration, but not applications for EUPs, makes little sense, and that if its data is not to be disclosed, it should not be disclosed for any purpose. Rohm & Haas argues, in essence, that other manufacturers could get a competitive "jump" by being permitted to rely in their EUP applications on previously submitted data, generated at great time and expense by their competitors.

The EPA counters that argument by stressing that all applicants must ultimately generate all the needed data in order to register their product and enter it on the market, and that applicants therefore do not get a "free ride"; at best, the advantage is merely one of timing. Moreover, EPA suggests it simply does not have the resources to review both registration and EUP applications totally on a *de novo* basis.

All parties cite extensively to the legislative history to support their views of congressional policy concerns, as well as their interpretations of congressional intent based upon congressional awareness of agency practice.

Finally, on the question of Federal Register notification, plaintiff contends that EPA's failure to follow proper notice and comment procedures affords Rohm & Haas a basis for relief. On May 5, 1981, the day after this suit was filed, and the very day upon which EPA apparently proposed to issue Mobil's EUP, EPA issued a notice in the Federal Register soliciting comments pursuant to 40 C.F.R. Part 172 concerning Mobil's application. *See* 46 Fed.Reg. 25138. The regulatory provision cited by EPA in its Federal Register notice establishes a mandatory three-step notice and comment procedure: (1) issuance of a notice soliciting comments; (2) analysis of the comments received; and (3) holding of a public hearing if determined to be warranted on the basis of the comments received. *See* 40 C.F.R. § 172.11. Rohm & Haas wishes to enjoin EPA's issuance of Mobil's EUP until adequate time for comment and analysis has passed.

EPA argues that it was not required by the regulation to publish a notice of receipt of Mobil's EUP application, contending that it is only required to publish notice of applications for EUP's which "may be of regional or national significance,"[14] and that Mo-

14. 40 C.F.R. § 172.11 provides:

(a) Notice of receipt of an experimental use permit application. The Administrator shall

bil's application had no such "regional or national significance." In fact, EPA determined that it would publish a Federal Register notice concerning Mobil's application not because the agency was required to do so under 40 C.F.R. § 172.11(a), but solely to permit Rohm & Haas to pursue any judicial remedies it felt were appropriate. Rohm & Haas was in fact given notice of EPA's intent to issue the EUP to Mobil and in response to that notice Rohm & Haas has filed the instant lawsuit.

Moreover, EPA argues, nothing in 40 C.F.R. § 172.11 mandates that EPA wait a certain period of time after publication of the notice prior to issuance of the EUP. Once a required publication has occurred, the agency may issue the EUP at any time. If, based on comments and any public hearing, the Administrator determines that the EUP should be cancelled, he may revoke the EUP pursuant to Section 5(e) and 40 C.F.R. § 172.11.

Finally, EPA points out that Rohm & Haas has in fact had the opportunity to comment, and has done so through the forum of this litigation, but that EPA did not agree with Rohm & Haas' objections.

Rohm & Haas contends that it is irrelevant what motive EPA had in issuing the notice, and that the publication necessarily reflected a determination that Mobil's application was of regional or national signifi-cance by the terms of the regulation (quoted at fn. 14 *supra*). Even if the notice had not been originally required, plaintiff argues, the EPA cannot make a sham out of the request for comment by finalizing the decision to grant Mobil's EUP before waiting a reasonable period for comments. In other words, in plaintiff's submission, once the agency elects to invoke § 172.11, that election is binding on the agency, and it must follow the appropriate procedures.

We turn next to our findings of fact.

## ·IV.  FINDINGS OF FACT

### A.  THE DEVELOPMENT AND REGISTRATION OF BLAZER

Beginning in the 1950s, Rohm & Haas concentrated on the discovery of an effective herbicide that would combat the chronic weed problems that afflict soybean production.[15] Even though soybeans have become an important United States agricultural product, soybean yields have been reduced because a variety of fast-growing weeds have stifled soybean growth. More than ten years ago, Rohm & Haas' laboratories began evaluating the properties of hundreds of chemical compounds to determine whether any of them might effectively combat the varieties of weeds that typically infest soybean crops. After extensive re-

publish notice in the Federal Register of receipt of an application for an experimental use permit upon finding that issuance of the experimental use permit may be of regional or national significance. This notice shall include:
(1) The active ingredients.
(2) Use pattern(s).
(3) Quantity of pesticide.
(4) Total acreage,
(5) Location of area of application,
(6) A statement soliciting comments from any interested persons regarding the application.
(b) Public hearing. The administrator may hold a public hearing, and publish notice in the Federal Register of the date and location of the hearing, when he determines that there is sufficient interest in the application to warrant a hearing, based upon the comments received in response to the Notice of Receipt of an Application, or that a hearing would otherwise be in the public interest.

(c) Issuance of experimental use permit. The Administrator shall give prompt notice in the Federal Register of the issuance of an experimental use permit. The notice shall include:
(1) The active ingredients,
(2) Use pattern(s).
(3) Quantity of pesticide,
(4) Total acreage,
(5) Location of area of application,
(6) A statement indicating where the experimental use permit is available for public inspection.

15. Jerry Smith, Rohm & Haas' chief toxicologist, testified on the basis of the public record and certain Mobil data which by happenstance came into his possession. While Dr. Smith did not assail the validity of EPA's conclusions (he has not seen Mobil's data, as EPA has), he did raise questions about the adequacy of EPA's analysis and the validity of EPA's comparison of the Mobil and Rohm & Haas data.

search and laboratory experimentation, in 1973 Rohm & Haas identified the active ingredient of the sodium salt of acifluorfen for potential use as a pesticide. It thereupon engaged in a very extensive effort which consumed two years to complete a pesticide product with appropriate inert ingredients, which would be commercially marketable.

In order to commercialize its new discovery, Rohm & Haas conducted various toxicity, residue, and environmental tests from 1975 through late 1976 to demonstrate that a compound containing acifluorfen could be used on soybeans on an experimental basis without risk to health or the environment. Based on these tests, on January 12, 1977 Rohm & Haas applied to the EPA for an EUP which would enable it to undertake more extensive field testing of the compound as a predicate to full registration of the chemical as a pesticide under FIFRA. Pursuant to 7 U.S.C. § 136c(a) and 40 C.F.R. § 172.4(b)(vi), Rohm & Haas submitted research and test data to support its application for an EUP and to demonstrate that experimental field testing of the product could be conducted safely. On November 1, 1977, the EPA granted the application for an EUP and for a temporary tolerance for the company's experimental soybean pesticide.

Under the authority of the EUP, Rohm & Haas then conducted additional tests required for registration of the soybean pesticide during 1978 and 1979 in an attempt to fully discern the product's safety and efficacy. On December 14, 1978, Rohm & Haas submitted an application for the full registration of its new soybean pesticide under the name of Blazer. The final registration application for Blazer was supported both by research and test data that had subsequently been developed under the EUP and

by other research and test data that had been developed by Rohm & Haas. The EPA granted Rohm & Haas's application for the registration of Blazer on April 10, 1980. Since April 10, 1980, when Rohm & Haas's soybean pesticide Blazer was registered for commercial use, Blazer has been marketed in 29 states and 12 foreign countries. In the short time that it has been on the market, Blazer has played an important role in the agricultural industry.

## B. THE IMPORTANCE OF THE EUP

In view of the vigor with which Rohm & Haas has asserted its proprietary claims, we explored with Mr. Akerman the question of the role of the EUP in the overall pesticide registration process. His responses, which we credit, corroborate Rohm & Haas' evidence on the point and also support Rohm & Haas' policy argument. What Mr. Akerman confirmed was that the generation of research and test data needed to obtain an EUP requires a significant commitment of resources that represents a major portion of the total research and test data package which final registration applicants must submit to the EPA,[16] and that fifty to seventy-five percent of the data ultimately submitted to the EPA for final registration purposes must first be generated to obtain an EUP.[17]

## C. MOBIL'S EUP APPLICATION FOR "TACKLE"

On January 5, 1981, Mobil submitted an application to the EPA for an EUP for Tackle, which contains as an active ingredient the sodium salt of acifluorfen. In connection with its EUP application, Mobil submitted product chemistry data to the EPA

---

**16.** This case does not raise trade secret disclosure problems under § 10 of FIFRA.

**17.** Mobil's protestations that EPA did it no favor by its shortcut consideration of Mobil's EUP application seems hollow however, in view of the fact that delay in consideration of the Tackle application, just like delay in decision of this case, would cause another growing season to go by before Tackle could be tested in the field. Rohm & Haas has suggested that

such delay need not concern us since there is so much work to be done between grant of the EUP and submission of application for full registration of a pesticide that the § 3 registration application could not in any event be submitted until after the 1982 growing season. We share Mobil's view that such charitable suggestions from Rohm & Haas should not be considered herein.

showing that the pesticidally active ingredient of Tackle is the sodium salt of acifluorfen, which is also the active ingredient of Rohm & Haas' Blazer.

EPA has compared product chemistry data regarding the manufacturing process submitted by Mobil, including information regarding the purity of the starting materials, the description of the process itself, the production of impurities, and the methods of analysis for the active ingredient and the major impurities, with like product chemistry data submitted by Rohm & Haas. That comparison led EPA to conclude that: (a) the Mobil process for producing the sodium salt of acifluorfen yields a technical-grade substance which contains almost exactly the same percentage (approximately 79%) of the sodium salt of aciflourfen as the Rohm & Haas technical-grade substance; (b) the Mobil technical-grade substance contains fewer impurities than the corresponding Rohm & Haas substance; (c) all the impurities that may be present in the Mobil technical-grade substance also may be present in the Rohm & Haas substance; and (d) the inert ingredients which Mobil adds to the technical-grade substance during formulation of its end-use product, Tackle, have been approved under the Federal Food, Drug & Cosmetic Act (FFDCA) for use in products to be applied to food crops.

In short, based upon a comparison of the product chemistry data submitted by Mobil for Tackle with that submitted by Rohm & Haas for Blazer, and a comparison of the EUP label terms and conditions proposed by Mobil for Tackle with those approved for Rohm & Haas' Blazer registration, EPA concluded that granting Mobil an EUP for experimental use of Tackle on soybeans, and allowing the sale and distribution of Tackle-treated soybeans in commerce, would not subject the public to any risks over and above those risks, if any, posed by the use of Rohm & Haas' Blazer on soybeans. EPA's conclusion that issuance of the EUP to Mobil is warranted was based on Rohm & Haas' registration of Blazer, which had been issued on the basis of Rohm & Haas data. In fact, EPA would not have granted Mobil's EUP without Rohm & Haas' data on file.

Paragraph 9 of the stipulation of facts, which we hereby convert into a finding, establishes that:

EPA would have required submission by Mobil of more data in support of Mobil's TACKLE soybean EUP than Mobil has submitted, and would have subjected that additional data to much more comprehensive review, but for the fact that, based on the analysis referred to in paragraph 8 [involving Rohm and Haas' data], EPA concluded that the experimental use of TACKLE proposed by Mobil would not pose any hazards greater than those already posed by the commercial-scale use of Rohm and Haas' Blazer on soybeans which EPA already had approved.

This finding is not, however, intended to suggest that Mobil presented a "bare bones" application, looking for a "free ride" on Rohm and Haas' research. Mobil's EUP application was supported with data which it generated on its own as well as with some information already in the public domain. Mobil submitted all the tests and studies normally required to warrant an EUP and was prepared to discuss any deficiencies in its data had EPA indicated that there were any. Mobil gave EPA product chemistry, environmental chemistry, toxicology, efficacy, residue, and other reports. Mobil did not request the EPA to rely upon or to refer to Rohm & Haas' or any other company's proprietary or confidential data.

EPA did not thereafter request from Mobil any additional data in support of its application. Nor did it raise any deficiencies with Mobil. It may well be that Mobil's application was sufficient on its own, without reference to Rohm & Haas' data, but we cannot so find on the record.[15] EPA, as a matter of standard procedure prompted by considerations of administrative convenience (which we find justified because of EPA's limited staff), elected not to evaluate all of Mobil's data but rather to reference Rohm & Haas' product chemistry in order to compare it with Mobil's tackle product to determine if the two products

were chemically the same or substantially similar.

EPA admitted during its testimony that it never attempted to analyze Mobil's data package because it was satisfied that Mobil's product was the same or substantially similar to a preexisting product, a decision reached—we repeat—based upon standard EPA operating procedure and not at the request of Mobil. As Mr. Akerman testified, the amount of material submitted by Rohm & Haas which EPA referenced in considering the Mobil application was an extremely small portion of the "yards high" amount of data which Mobil had previously submitted. Mobil has not seen and will not see Rohm & Haas' data.[16] With the exception of expedited consideration, Mobil thus derived no benefit from EPA's decision to review the Rohm & Haas product chemistry because it had submitted all of its own product chemistry data.[17]

Other than product chemistry, the only data issue which arises relates to residues. Residue data is used in two ways. First, it is used to establish a tolerance under the Federal Food, Drug and Cosmetic Act. As we explained above, tolerances are acceptable levels of pesticide residue in food or feed; in order to protect public health, the tolerance sets the maximum permissible amounts of the pesticides which may remain on a food crop following the pesticide treatment. Once a tolerance is established under the Act, any subsequent applicant for registration of the same or a substantially similar product is entitled to reference that tolerance and need not submit its own independent data to reestablish the tolerance. Residue data is also used a second way. If a tolerance has already been established, applicants for EUPs may be required to submit residue data sufficient to show that the proposed product, if applied, would result in residues that are within the tolerance limits.[18]

Rohm & Haas has submitted to EPA data sufficient for EPA to conclude that the use of the sodium salt of acifluorfen in a product such as Blazer, at the application rates and in the manner proposed by Rohm & Haas, will yield residues of acifluorfen (and related compounds of concern) on soybeans which will not endanger the public health. Accordingly, EPA has published regulations under section 408 of the FFDCA establishing permissible residues of acifluorfen (and related compounds) on soybeans. *See* 40 C.F.R. § 180.383, 45 F.R. 18990 (March 24, 1980). The EPA has found that the rates of application of Tackle to soybeans proposed by Mobil, on a pounds-of-active-ingredient-per-acre basis, are all less than the maximum rate for Blazer already approved by EPA. The EPA approval of the maximum Blazer application rate was based on EPA's review of Rohm & Haas data showing that the resulting pesticide residues on soybeans would not exceed the residue levels approved under the FFDCA.

The Federal Food, Drug and Cosmetic Act operates without the constraints which might otherwise be imposed upon EPA's consideration of data by Section 3 of FIFRA. The EPA testimony relating to the need for additional residue data from Mobil referred to data which would have been necessary if Mobil had intended to establish its own tolerance. This Mobil did not intend to do, and it was not required to do so to obtain an EUP.

EPA's consideration of the Mobil data and the Rohm & Haas data—and its comparison of the two—consumed some 80 work hours. EPA concluded that there is no scientific reason to deny the EUP for Tackle, and that no threat of unreasonable adverse effects on the environment will be posed by use of Tackle under the EUP. On the basis of its review, and without regard to any Federal Register publication, EPA determined on April 28, 1981 that it would issue an EUP for Tackle. Its notification to

---

18. However, even had Mobil submitted no residue data whatsoever, the only result under EPA's EUP procedure would be that the crops upon which the Mobil Tackle would be applied

under the EUP would have to be destroyed, rather than sold as under the proposed test program.

Rohm & Haas of this intention triggered this lawsuit.[19]

EPA's consideration of Mobil's EUP application and its decision to approve the application were based on and consistent with the standard criteria that EPA applies to all requests for EUPs. As we have noted above, EPA, in considering EUPs, has consistently been of the view that exclusive use and data compensation provisions apply only to EPA's consideration of data in pesticide registrations under FIFRA Section 3 and not to the Agency's evaluation of applications for EUPs under FIFRA Section 5.

## D. THE FEDERAL REGISTER NOTICE

It is the practice of Rohm & Haas, and, we assume, most major pesticide manufacturers, to monitor the public actions of EPA and to extend a "grapevine" respecting the activities of their competitors. Rohm & Haas thus became aware of the pendency of Mobil's application, and Dr. Krzeminski conferred on a number of occasions with EPA officials about their intentions respecting the application, also offering some informal comments about the subject matter. As the resolve of EPA to issue the EUP became more firm, Rohm & Haas' Washington, D. C. counsel became involved in the inquiry as to EPA's intentions.[20]

On May 5, 1981, EPA published a Federal Register notice describing Mobil's application for an EUP and inviting public comments thereon. 46 Fed.Reg. 25138. EPA has represented that the Federal Register notice was published for the sole purpose of giving Rohm & Haas formal notice of its intention to issue the EUP to Mobil, hence to enable Rohm & Haas to bring a timely lawsuit. The EPA affirms that before publicly announcing receipt of Mobil's application for an EUP in the Federal Register[21] and soliciting comments concerning such EUP, EPA had decided to grant Mobil's application for an EUP.

According to the EPA's own regulations, receipt of EUP applications should be commenced in the Federal Register, and comment invited thereon, only when the EUP applications have "regional or national significance." Mr. Akerman reviewed the applicable criteria and testified that the application lacked "regional or national significance" under those standards. We credit that testimony. Mr. Akerman further testified that a reasonable period for comment was ten days (the regulations are silent on that point), and he opined that, under the circumstances, there was no reason to expect comment from any source other than Rohm & Haas.

For reasons articulated *infra*, we would, in the ordinary course, be reluctant in the extreme to permit an agency to treat a published notice as a nullity. Aside from the mootness question (ten days have elapsed as of the filing of this opinion, and we were informed at 9:00 A.M. this day that there has been no comment other than Rohm & Haas' comments which track those advanced through the vehicle of this suit),

---

19. In terms of labelling, EPA's review of the Mobil product chemistry data submissions, and EPA's comparison of the Mobil product chemistry data with the product chemistry data earlier submitted by Rohm and Haas, has led EPA to conclude that the two products should be labelled in the same manner with respect to the hazards of the product to man or the environment, and with respect to precautions to be taken in connection with their use. Thus, Mobil will be required to amend its label to provide the following: 1) the crop rotation restriction included on Rohm & Haas' commercial label for Blazer; 2) the crop failure restrictions on Rohm & Haas' commercial label for Blazer; 3) a statement that the Mobil's Tackle pesticide is "for use only at an application site of a cooperator and in accordance with the terms and conditions of the experimental use permit,"

4) a statement that the pesticide is being used "to evaluate control of" various pests; and 5) a statement that "This labeling must be in the possession of the user at the time of pesticide application."

20. We reject EPA's submission that the communications of those Rohm & Haas representatives constitute sufficient "comment."

21. EPA routinely publishes in the Federal Register the issuance of EUPs. Such notice does not energize comment, though if it is received, the EPA can take it into account in its monitoring activities. It is only the publication of receipt of an EUP that is intended to engender comment.

we acquiesce in EPA's actions—for which its counsel expressed regret and apology—only because of Rohm & Haas' lack of standing to object.

The original basis for Rohm & Haas' objection on this point was alleged environmental harm. However, Dr. Smith conceded at trial that the record evidence did not justify any such conclusion. Neither did Rohm & Haas produce any evidence that would support its theory that its Blazer product would be disparaged on some "enterprise" theory because of the putative defects in Tackle. Thus Rohm & Haas lacks standing.

## V. DISCUSSION

### A. INTRODUCTION

Against the background of our findings of fact and our discussion of the statutory framework and the contentions of the parties, we now take up each of the three major points involved in the case. Although the result we reach stands on independent grounds with respect to each of the three points, we note that the result we reach is buttressed on all these points by the venerable rule that an agency's interpretation of a statute which it is charged with administering is entitled to deference by a reviewing court, *See Environmental Protection Agency v. National Crushed Stone Association*, 449 U.S. 64, 101 S.Ct. 295, 66 L.Ed.2d 268 (1980); *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *American Iron and Steel Institute v. EPA*, 526 F.2d 1027, 1041–1042 (3rd Cir. 1975), *cert. denied*, 435 U.S. 914, 98 S.Ct. 1467, 55 L.Ed.2d 505 (1978), and that deference is particularly appropriate where (as here) the agency participated extensively in drafting the legislation which is being interpreted. *Hercules, Inc. v. EPA*, 598 F.2d 91, 101 (D.C. Cir. 1978); *Certified Color Manufacturers Association v. Mathews*, 543 F.2d 284, 294 (D.C. Cir. 1976).

We have not addressed herein the question of the standing of Rohm & Haas to assert that the issuance of an EUP to Mobil would violate the alleged data requirement provisions of Section 5 or the data consideration restrictions established by Section 3(c)(1)(D) which plaintiff submits are applicable to EUPs. It is not that we deem defendants' contention that Rohm & Haas has suffered no "injury in fact," *see Duke Power Company v. Carolina Environmental Study Group*, 438 U.S. 59, 72, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978), to be insubstantial. The principal harm which Rohm & Haas alleges it will suffer is harm to its trade secret and exclusive use rights, which it has alleged in connection with its statutory interpretation challenges, and the prospect of the chilling effect that the issuance of an EUP to Mobil will have on its research and development program. (Rohm & Haas does not allege competitive harm, for issuance of an EUP does not inexorably lead to full registration, and the appearance of Tackle on the market place is some time away.) We are cognizant of the potential impact on plaintiff's standing claims of *Chevron Chemical Company v. Costle*, 641 F.2d 104 (3rd Cir. 1981). We have elected not to address the standing question because it is closely intertwined with the merits, because it is so close (the parties concede the closeness of the question), and because, given our alternative disposition of the merits, it is unnecessary.

### B.  DOES SECTION 5 OF FIFRA ALLOW AN EUP TO BE BASED ON DATA OTHER THAN THAT SUBMITTED BY THE APPLICANT?

We deem Rohm & Haas' contention that the language of Section 5 precludes EPA from considering data supplied by someone other than an EUP applicant in acting upon the EUP to be patently without merit.

■ The only language of Section 5 which Rohm & Haas cites to support its reading of the statute is the section's requirement that EPA act on the EUP application within 120 days "after receipt of the application and all required supporting data." This language neither requires an applicant to submit all its own supporting data nor forbids EPA from considering data from other sources. It merely provides for

timely action on an EUP application by EPA. In fact, this language was not even contained in Section 5 as it was originally enacted in the 1972 amendments, but rather was only recently added in the 1978 amendments. Section 10 of Pub.L. 95–396, 92 Stat. at 828. Moreover, the legislative history of the 1978 amendments demonstrates that the change in language was merely intended to provide a specific time deadline for EPA to act on applications for EUPs, not to prohibit EPA from considering data other than that submitted by the EUP applicant. H.R.Rep.No. 95–663, 95th Cong., 1st Sess. at 30–31; *see also* S.Rep.No. 95–1188, 95th Cong. 2d Sess. at 48 (Conference Report), U.S.Code Cong. & Admin.News 1978, p. 1966.

Further, there is nothing in EPA's regulations implementing the EUP program, 40 C.F.R. § 172.1 *et seq.*, which requires the EUP applicant to submit all its own data. While 40 C.F.R. § 172.4(b)(vi) does require an EUP applicant to describe any tests of the product and their results which have been "conducted by the applicant," again, this section does not require that all tests which would support the EUP must be done by the applicant.

## C. DO THE DATA–CONSIDERATION RESTRICTIONS CONTAINED IN SECTION 3(c)(1)(D) APPLY TO APPLICATIONS FOR EUP'S UNDER SECTION 5?

The most critical—and most difficult—question before us is the applicability of the data consideration restrictions contained in Section 3(c)(1)(D), described *supra*, to applications for EUPs under § 5. Rohm & Haas, pointing to the elaborate restrictions contained in § 3, obviously designed to protect proprietary rights and to encourage research and development, argues with great force that, in light of the importance of the EUP to the full registration process, *see* Part IV.B, *supra*, it would result in virtual emasculation of the congressional policies

underlying § 3 if its Blazer registration data could be relied upon by the EPA to award Mobil an EUP.

However, abstract notions of policy are not helpful in the exercise of statutory construction unless they are rooted in Congressional intent. Defendants' policy arguments—*inter alia* that Congress' main objective in passing FIFRA was to achieve safe and effective registration of pesticides, not to protect a manufacturer's test data—are also forceful.[22] We must therefore rely upon the statutory language, and where that is opaque, upon the Congressional intent as reflected by the legislative history and analysis of the statutory scheme.

Defendants' primary argument is bottomed on the fact that the language of § 3(c) specifically limits the application of that section (including the data consideration restrictions) to applications for *registration*. Section 5 contains no such restrictions, and defendants say that if Congress had meant them to apply to § 5, it would have inserted a cross-reference. This argument is more than a makeweight, in terms of ordinary statutory constructional principles. It is elevated to considerable, indeed determinative significance in light of the legislative history with which we have been supplied by counsel. That history is set forth extensively in the EPA's brief, to which House, Senate, and Conference Reports were attached.

*Inter alia* that history shows that Congress was quite familiar with FIFRA, which was amended three times in seven years, and was familiar with EPA's interpretation of FIFRA in terms of its ability to rely upon data submitted by previous applicants. Those facts would suggest that when Congress confined the data consideration restrictions to § 3 it did so intentionally. What is more convincing, however, is the legislative history itself. FIFRA originally had no data consideration restrictions. They were inserted in the statute at the behest of the industry. But the various

---

**22.** This policy argument subsumes the notion that administrative convenience is also important.

hearings and reports in which the data consideration restrictions were discussed, including those relating to the 1978 Amendments, in which § 3(c)(1)(D) was completely rewritten, all refer to registration, even though the EUP procedures were known to all concerned. We shall not extend the discussion here by relating the legislative history; it is covered amply in defendants' briefs.[23]

The final version of § 3(c)(1)(D) was a compromise between House and Senate versions. Section 3(c)(1)(D)(ii) does mention "data submitted by an applicant or registrant to support an application for registration, *experimental use permit*, . . .", and provides that the Administrator may not, without permission of the original data submitter, consider any item of data in support of an application by any other person without payment of compensation. Section 3(c)(1)(D)(i) does not mention EUP's in its provision that, with respect to pesticides containing active ingredients that are initially registered after September 30, 1978, data submitted to support the application for the original registration of the pesticide shall not, without permission of the original data submitter, be considered by the Administrator to support an application by another person for a ten-year period.

The EPA elucidates these provisions with aid of a useful distinction—between the category of data covered and the type of regulatory activity to which the requirements are to be applied. In Section (ii), the reference to EUP support data refers to the type of data covered. There is nothing in Section 3(c)(1)(D) (or of course in Section 5)

about applying the data restrictions to EUP applications as a type of regulatory activity. Notwithstanding Rohm & Haas' contention that the House Bill which is said to have focused on ownership rights in submitted data prevailed over the Senate version, there is no indication even in the House Bill, in terms of *the type of regulatory activity to which the requirements apply*, that it was concerned with EUP proceedings. By the same token, the passage in the Conference Report on which Rohm & Haas relies [24] is subject to the same distinction. That distinction undermines Rohm & Haas' argument.[25]

In sum, although Section 3(c)(1)(D), which deals with registrations, provides data submitters with economic protection against "me-too *registrants*" who had relied on their data, it does not apply to the issuance of EUP's. It is plain that Congress knew what it was doing when it failed to make the restrictions applicable. This conclusion still leaves us with the question whether this failure comports with the apparent Congressional solicitude for proprietary rights in research and development data. We conclude that since an EUP does not allow the permit holder to compete commercially against any data submitter upon whose data EPA has relied in connection with the issuance of the EUP, Congress saw no reason to apply the restrictions, notwithstanding the "leg-up" the me-too applicant may obtain. Moreover, the data used in connection with the EUP is entitled to protection when the EUP ripens into full registration.[26]

23. While we have not dwelled on defendants' arguments, set forth at pages 19 to 21 *supra* about the meaning of the term "applicant" and "application" in the statute, (and although it is less important, in the Regulations), those arguments also support defendants' position.

24. Data submitted in support of a request for an experimental use permit for a pesticide containing a new active ingredient registered after the date of enactment of the bill or a new use for such pesticide will be considered as data to support the pending registration of such pesticide or new use. Accordingly, such data will not be available to other applicants without the

consent of the original data submitter for a period of 10 years from the date the product is initially registered.

25. That passage does, however, inform Section 3(c)(1)(D)(i) by making clear that data submitted to support registration application includes EUP data. EUP data is not mentioned in § (i), but without that interpretation, there would be a considerable loophole in the data consideration requirements.

26. We note too that (post-1978) EUP data later used by the submitter to support a registration

Additionally, given the shortage of personnel in EPA and what we perceive to be the overriding Congressional concern of achieving safe and effective registration of new pesticides, the failure to apply the data consideration restrictions to EUPs would appear to comport with sound policy notions. Plaintiff's position cannot therefore prevail.

Having thus concluded, we note our uneasiness that our decision results in some erosion of the proprietary rights of data submitters such as Rohm & Haas, thus creating tension with one of the Congressional policies in the area. However, if values or policies in this field are to be reordered, or if brighter lines are to be drawn, it is for Congress to do so, and not this Court.

D. MUST THE EUP BE DENIED FOR FAILURE TO AWAIT COMMENT FOLLOWING THE FEDERAL REGISTER PUBLICATION?

We have explained in Part IV.D supra why the Federal Register problem is essentially mooted, and why Rohm & Haas has no standing to complain about it. We hasten to observe that, notwithstanding our acceptance of EPA's position that it was not necessary that the Federal Register notice be published, we would, but for the circumstances noted, enforce the consequences of that publication. *See, inter alia, Sharon Steel Corp. v. EPA*, 597 F.2d 377, 381 (3d Cir. 1979); *National Tour Brokers Association v. U. S.*, 591 F.2d 896, 902 (D.C. Cir.1978); *Texaco, Inc. v. F.P.C.*, 412 F.2d 740, 744–45 (3d Cir. 1969).

## VI. CONCLUSION

For all the foregoing reasons, relief must be denied and judgment entered for the defendants. However, it is possible that the Court of Appeals may disagree with us. Therefore, in order that issuance of the EUP and prompt dispatch of Tackle to the test sites across the country and application of it to the soybean crop not render nugatory the plaintiff's claim even if it succeeds on appeal, we shall stay our order and pro-

hibit EPA from issuing the EUP until such time as the Court of Appeals acts upon a motion for injunctive relief pending appeal which plaintiffs must file in the Court of Appeals by Noon tomorrow. Were it not for the exigent circumstances, we would not grant interim relief.

An appropriate Order follows.

application will become exclusive use data rather than merely compensable data when a later applicant for registration seeks to rely upon them.